IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LISA L. PETER,<br><br>              Plaintiff,<br><br>vs.<br><br>CITY OF YORK, NEBRASKA,<br><br>              Defendant. | 4:12-CV-3169<br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on the City of York's motion for summary judgment (filing 31). The Court will grant that motion in part, and take the remainder of the motion under advisement. Specifically, the Court will grant summary judgment in favor of the City with respect to the plaintiff's Americans with Disabilities Act (ADA) claim. But there is an issue with respect to the plaintiff's claim under Title VII of the Civil Rights Act of 1964 that the Court is unable to resolve. Therefore, the Court will direct the parties to provide additional briefing before deciding the summary judgment motion with respect to the Title VII claim.

## BACKGROUND

      The plaintiff, Lisa Peter, was a firefighter and paramedic for the City for 10 years, and the only female firefighter hired by the City before losing her job in October 2010. Filing 33 at 6, 10-11.[1] She lost her job as the result of an injury she suffered in May 2010; she claims the City violated Title VII and the ADA by treating her injury differently than it had treated the illness of a male firefighter, Mike Steube, a few years earlier. *See* filing 2 at 9-13.

## STEUBE'S ILLNESS

      Steube was hospitalized in March 2007 with severe pancreatitis that caused him to fall into a coma. Filing 33 at 6. At the time of his illness, he had a total of 377.5 hours of accrued floating, sick, and vacation leave, in

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1).

addition to 12 weeks of Family and Medical Leave Act (FMLA) leave. Filing 32-5 at 27. City firefighters generally work a schedule of 24-hour shifts followed by 48 hours off. Filing 33 at 6. Jack Vavra, the City Administrator, switched Steube's schedule to a 30-hour-per-week schedule so that while he was ill, Steube could maintain his insurance and not run out of leave. Filing 35-4 at 40-41.

Steube's recovery took some time. His doctor cleared him to "start back to work 3 hours light duty" on May 30, 2007. Filing 35-2 at 23. Both Vavra and Kevin Stuhr, the City Fire Chief, testified to their understanding that Steube was only limited in the hours he could work in a day, not the duties he could perform. Filing 35-4 at 15-16; filing 35-6 at 23. But his doctor's note does not explain what was meant by "light duty," and Steube said he would not have been strong enough to go out on any calls. Filing 35-2 at 8-9.

Starting on June 4, 2007, Steube was assigned to duty that involved collecting information on local businesses to be stored in a database, so that the information would be quickly available to the firefighters in case of an emergency.[2] Filing 35-4 at 29-30. Stuhr explained that it was "kind of a one-time deal" because the City was, at the time, evaluating a computer program that would have been used to store the information. Filing 35-6 at 14.

On June 5, 2007, Steube exhausted his available accrued leave, and he began using 360 hours of FMLA leave.[3] Steube was working 3 hours a day, 5 days a week, and using 3 hours of FMLA leave each workday. Filing 32-5 at 28-29. And because he was working part time, he also accrued a few new hours of sick leave a month. Filing 32-5 at 28-29. His doctor cleared him to return to duty without restrictions on August 27, Filing 35-2 at 24. He had not exhausted his FMLA leave before then, and he returned to full-time 24-hour shifts on the next day. Filing 32-5 at 29.

---

[2] Peter said that she also saw Steube, when he was at the station, performing other tasks like taking out the trash, filing, and cleaning—tasks that were part of a firefighter's usual duties. Filing 35-1 at 25-26. But Steube did not remember doing so, and there is nothing in the record to suggest that those tasks were officially taken from other firefighters and reassigned to Steube. Filing 32-4 at 8. And the information-gathering duties assigned to Steube did involve time at the station filing the information. Filing 32-4 at 5.

[3] Under the FMLA, an employee is entitled to 12 work weeks of leave a year, and when on a reduced leave schedule, an employee's leave is calculated based on the employee's actual workweek. See, 29 U.S.C. § 2612(a)(1) and (b)(1); 29 C.F.R. § 825.205(b)(1). Because Steube's schedule had been changed to 30 hours per week, his 12 weeks of FMLA leave provided him with 360 hours to be used in his reduced leave schedule. See 29 C.F.R. § 825.205(2).

## PETER'S INJURY

In late May 2010, Peter fractured her heel in a non-work accident. Filing 33 at 9. At the time of her injury, she had 212.7 hours of accrued floating, sick, and vacation leave in addition to FMLA leave. Filing 32-5 at 30. She was placed in a cast extending to just below her knee, and underwent surgery soon thereafter. Filing 35-1 at 23, 37.

Peter's captain told her about how Steube's leave had been calculated while he was sick. Filing 35-1 at 17. Peter met with Vavra about 2 weeks after her surgery, in June 2010, and told him that, according to her doctors at the time, she would be on crutches for about 12 weeks. Filing 35-1 at 26-27. Peter said she asked if light duties were available, and Vavra had replied, "We do not offer light duty." Filing 35-1 at 27. It is not disputed that, aside from Steube, the City has not made light duty available to firefighters, because light duty is inconsistent with the physical demands of the job. Filing 33 at 9.

Peter's accumulated leave was being depleted at a rate of 24 hours for each shift that she missed. Filing 32-5 at 30. By July 11, 2010, she had used her accrued leave and began using her FMLA leave. She was credited with 672 hours of FMLA leave, based on 12 weeks of leave and an average workweek of 56 hours. Filing 32-5 at 30.

On September 24, 2010, Peter obtained a doctor's note clearing her for light duty. Filing 35-1 at 55. She was still on a crutch and working on weight bearing. Filing 33 at 11. So, her doctor said she was only "[a]ble to use up to 20 pounds of force occasionally; or up to 10 pounds of force frequently; and a negligible amount of force constantly to move objects." Filing 35-1 at 55, 62. Peter was "unable to return to regular duty due to her foot injury." Filing 35-1 at 55. She said she could have been cleared for light duty earlier, but had not asked to be because she had been told that light duty was unavailable. Filing 35-1 at 33.

Peter testified that on September 25, 2010, she went to Vavra and asked again for light duty, and was told that the City did not offer light duty. Filing 35-1 at 31. She also asked to be put on a reduced hourly schedule, as Steube had been, but was told that the City did not do that either. Filing 35-1 at 31. She exhausted her FMLA leave on October 3, and the City fired her.[4] Filing 33 at 10-11. It was over a year later that Peter was finally cleared to work without restrictions, on January 16, 2012. Filing 33 at 11. In the

---

[4] The record reflects a semantic dispute about whether Peter was fired, "separated from employment," or deemed to have constructively resigned. The Court does not see the difference, or why it matters.

- 3 -

meantime, Peter's job had been filled by a male replacement who lacked her qualification as a paramedic. Filing 32-6 at 6. This litigation followed.[5]

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.*

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). And the Court may grant the motion on grounds not raised by a party after giving notice and a reasonable time for the parties to respond. *See* Fed. R. Civ. P. 56(f).

## ANALYSIS

An employee may survive an employer's motion for summary judgment either by producing direct evidence of discrimination, or by showing a genuine dispute for trial under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Floyd-Gimon v. Univ. of Ark. for Med. Sci.*, 716 F.3d 1141, 1149 (8th Cir. 2013). Peter contends that she has presented direct evidence, based on her claim that she and Steube were treated differently.[6] The Court disagrees.

Direct evidence of discrimination shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Floyd-Gimon*, 716 F.3d at

---

[5] The City does not dispute that Peter has fulfilled the administrative prerequisites to suit. Filing 2 at 9; filing 5 at 1.

[6] Peter contends that the direct evidence is, in fact, so overwhelming that the Court should grant summary judgment in her favor *sua sponte*. The Court declines to do so, both because the evidence does not warrant it and because to do so without appropriate notice and briefing would disregard the Federal Rules of Civil Procedure and this Court's local rules. The Court may consider summary judgment *sua sponte*, and, in fact, does so in this order. But the appropriate practice for a party seeking summary judgment is to actually file a motion for summary judgment.

1149; *see also*, *Evance v. Trumann Health Servs.*, 719 F.3d 673, 677 (8th Cir. 2013); *Cronquist v. City of Minneapolis*, 237 F.3d 920, 925 (8th Cir. 2001). The direct evidence must clearly point to the presence of an illegal motive. *Floyd-Gimon*, 716 F.3d at 1149.

But Peter's claims of discrimination depend on circumstantial evidence that does not directly reflect the alleged discriminatory attitude of the City's decisionmakers. *See Cronquist,* 237 F.3d at 925. Instead, her evidence is of the sort that would require a series of inferences to be drawn before a discriminatory attitude could be attributed to Vavra, who made the employment decision she challenges. *See id.* Accordingly, the Court will consider Peter's claims under the *McDonnell Douglas* framework.

### TITLE VII

Under the burden-shifting framework set forth in *McDonnell Douglas*, Peter has the initial burden of establishing a prima facie case. *Muor v. U.S. Bank Nat'l Ass'n.*, 716 F.3d 1072, 1076 (8th Cir. 2013). If she establishes a prima facie case, then the burden of production shifts to the City to proffer legitimate, nondiscriminatory reasons for its actions. *Id.* Once the City meets this burden, Peter must produce evidence sufficient to create a genuine issue of material fact concerning whether the City's proffered reasons are pretext for discrimination. *Id.*

To establish a prima facie case of discrimination, Peter must show that she is a member of a protected class, she met the City's legitimate expectations, she suffered an adverse employment action, and the circumstances give rise to an inference of discrimination. *Id.* The City does not dispute the first three prongs of the test, but disputes the fourth, arguing that Peter, Steube, and Peter's eventual replacement were not similarly situated for purposes of inferring discriminatory intent.

The City's first argument is that "Steube's illness was much different" because Steube was in a coma and hospitalized, so "the City changed Steube to a 30 hour work week to ensure he maintained his health insurance during his hospitalization." Filing 33 at 17. So, the City contends, "[t]here was a medical reason the City changed Steube's schedule in that regard . . . [b]ut no such situation existed with respect to Peter." Filing 33 at 17. The City contends that Peter wanted her schedule changed so her leave would not run out; "[u]nlike Steube, there was no medical reason that she needed the City to change her schedule." Filing 33 at 17.

But the City admits that Steube's schedule was changed so that his leave hours would last longer. And the City refused to do the same for Peter. While Steube's illness was initially life-threatening, the Court is unable to

see how that is a legally relevant distinction. They were both unable to work, and both at risk of exhausting their available leave, but treated differently.

The City also argues that Peter and Steube were not similarly situated because according to the City, Steube was able to come back to work with no physical restrictions. The City claims that unlike Peter, Steube was limited only in the number of hours he could work per day. But that would explain only why Steube was offered part-time work—not why his workweek was shortened while Peter's was not. And more fundamentally, the record is far from clear on this point. While Vavra and Stuhr both testified to their understanding that Steube was not physically limited, the note from Steube's doctor is not clear on what was meant by "light duty," and Steube's own testimony suggests a lack of physical ability to perform a firefighter's duties. The record establishes that Steube could not be sent on emergency responses because he lacked the stamina to complete calls, which can often last more than 3 hours. A firefighter who cannot respond to emergency calls because he is incapable of completing them is just as unable to perform the essential duties of the job as a firefighter who cannot respond to emergency calls because of a lifting restriction.

Finally, the City claims that Steube was not similarly situated to Peter because at the time of Steube's illness, there was a "one-time effort" to gather business information, and that Peter was not similarly situated to her replacement because there was a good explanation for why her replacement was less qualified. But these arguments are misplaced—while they might be legitimate reasons for the City's actions, they say nothing about the individuals involved, and thus nothing about whether those individuals were similarly situated.[7]

In sum, the Court finds that Peter has presented a prima facie case of discrimination, and that the burden of production has shifted to the City to proffer legitimate, nondiscriminatory reasons for its actions. The City proffers two. First, the City points to the requirements of the FMLA. Under the FMLA, "[f]or intermittent leave or leave on a reduced leave schedule taken

---

[7] The City does not proffer these as legitimate, nondiscriminatory reasons for its actions, although they would seem to serve better in that capacity than the one in which they were offered. Nonetheless, even if considered in that regard, they do not support summary judgment. There is conflicting evidence in the record as to whether there was an ongoing need to gather information about local businesses or whether light duty could have been made available to Peter. In fact, Vavra told Peter that light duty was unavailable without asking Stuhr about it—although Vavra had not known that light duty was available to Steube until asking Stuhr about it. Filing 32-5 at 16; filing 32-6 at 7. And as with many of the City's arguments, while they might explain the failure to provide light duty, they do not explain why Steube's schedule was changed to prolong his leave, but Peter's was not.

- 6 -

because of one's own serious health condition . . . there must be a medical need for leave and it must be that such medical need can be best accommodated through an intermittent or reduced leave schedule." 29 C.F.R. § 825.202(b). The City asserts that it was required by the FMLA to deny Peter's request for a reduced work schedule.

The Court does not read the FMLA to support the City's construction. An employee is not *entitled* to a reduced leave schedule in the absence of a medical reason. *See Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 676 (8th Cir. 2001). But nothing in the FMLA prevents employers from adopting leave policies more generous than those required by the FMLA. 29 U.S.C. § 2653. And the City provided Steube with more than the FMLA required. The FMLA might have required the City to permit Steube to take his FMLA leave on a reduced schedule when he was working part time, but only if he could perform the essential functions of a firefighter's job while at work. *See Hatchett,* 251 F.3d at 676. And as noted above, there is a genuine issue of material fact on that point. In other words, nothing in the FMLA required the City to provide Steube with light duty, but the City did anyway. Nor does the FMLA speak to Steube's workweek—as noted above, the FMLA is predicated on an employee's actual workweek, and did not require the City to shorten Steube's.

In short, the City is simply incorrect in claiming that the FMLA would not have permitted the City to accommodate Peter. The FMLA sets a floor for medical leave, not a ceiling. *See* 29 U.S.C. § 2653. And having set the bar by accommodating Steube, the City must at least articulate a nondiscriminatory reason for treating Peter differently. *See Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1084 (8th Cir. 2013) (employee may demonstrate pretext by showing it was not employer's practice to respond as it did in plaintiff's case). Given the weakness of the City's position, there is a sufficient basis to find that this proffered reason is pretextual.[8]

The other reason proffered by the City is that no light duty was available when Peter was injured. As noted above, there is some conflict in the record on this point.[9] The City also argues at length that there is no duty

---

[8] The Court also notes that there is nothing in the record to suggest that the FMLA's supposed requirements *actually* motivated Vavra at the time that he made his decisions with respect to Peter. An employer is prohibited from inventing a post hoc rationalization for its actions at the rebuttal stage of the case. *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 570 (8th Cir. 2007).

[9] Peter even argues that Vavra's and Stuhr's affidavits should be stricken, because they are consistent with the witnesses' deposition testimony. The Court has considered the supposed inconsistencies, and finds nothing to be so contradictory as to warrant disregarding the evidence. *See Brannon v. Luco Mop Co.,* 521 F.3d 843, 847 (8th Cir. 2008).

under the ADA to create a light duty position for an injured employee. That may be, but it is no reason for treating employees differently on the basis of gender, and is thus unresponsive to Peter's Title VII claim.

In sum, the Court finds sufficient evidence in the record to establish Peter's prima facie case and to support a finding that the City's proffered reasons for treating Peter and Steube differently are pretextual. But there is another problem with Peter's Title VII claim that the Court cannot ignore. The adverse employment action at issue here is Peter's termination. But of course, Peter was actually terminated for a legitimate, nondiscriminatory reason: she was unable to return to work. *See Norman v. Union Pac. R.R. Co., 606 F.3d 455, 461 (8th Cir. 2010)*. The alleged differential treatment Peter relies on preceded her termination.

A plaintiff must show some causal link between the differential treatment and her adverse employment action. *Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 913 (8th Cir. 2006)*; *see also Muor, 716 F.3d at 1079 n.3*. Peter attempts to draw a connection by claiming that she would not have run out of leave absent the differential treatment. She claims that had she been given the same accommodations as Steube, "her weeks for available leave would have been nearly doubled and she would have been accruing leave time during her period of recuperation[,]" so "she would have been able to return to work and would not have been fired." Filing 36 at 15.

But the Court is unable to reproduce Peter's calculations. To begin with, Peter's available FMLA leave would not have been meaningfully extended had her workweek been shortened to 30 hours from the time of her injury, as Steube's was, because her 12 weeks of FMLA leave would have been calculated at 30 hours per week, as Steube's was, instead of 56 hours per week.[10] In other words, under the FMLA, 12 weeks is 12 weeks, regardless of the number of hours worked a week. And even if Peter had been able to work 15 hours a week,[11] and use her accrued leave at 30 hours per week, the Court is having some difficulty seeing how she could have extended her leave from October 3, 2010, all the way to January 16, 2012.

---

[10] Of course, Peter did not request a reduced workweek until her leave was almost exhausted, meaning she had already used most of her FMLA hours. It is not clear if Peter is claiming that her workweek should have been reduced from the start, or should have been reduced when she asked for it. Neither avails her: had her hours been reduced when she was injured, she would have "lost" nearly half her FMLA hours; had her hours been reduced when she asked, it would have been too late to make much of a difference.

[11] There is nothing in the record to suggest that Peter's workday was medically limited, as Steube's was. But Peter cannot claim she was discriminated against because she was not offered *more* than a similarly situated colleague.

- 8 -

In other words, it appears from the evidence before the Court that even had Peter received the same accommodations as Steube from the start, she still would have run short of leave before she could return to work without restrictions. And if that is the case, then the adverse employment action—her termination—would have been inevitable.

But this issue was not raised by the City, and the Eighth Circuit has repeatedly held that a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties. *Heisler v. Metro. Council,* 339 F.3d 622, 631 (8th Cir. 2003). It is fundamentally unfair to the nonmoving party to require her to address issues not addressed by the moving party in anticipation that the Court might rely on some unidentified issue to grant the motion. *Id.* Therefore, before deciding this motion for summary judgment as to Peter's Title VII claim, the Court will direct the parties to brief the issue of causation identified above.

## ADA

The burden of proof in an ADA case depends on the type of claim that is alleged. *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003). If a party alleges a claim of discriminatory disparate treatment, then the traditional burden-shifting framework of *McDonnell Douglas* will apply. *Fenney*, 327 F.3d at 711-12. The plaintiff must initially establish each element of the prima facie case. *Id.* To establish a prima facie case of discrimination under the ADA, an employee must show that she is disabled within the meaning of the ADA, is a qualified individual under the ADA and has suffered an adverse employment decision because of the disability. *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012); *see also Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153-54 (8th Cir. 2013). The employer must then rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Fenney*, 327 F.3d at 712. If the employer does this, then the burden of production shifts back to the plaintiff to demonstrate that the employer's nondiscriminatory reason is pretextual. *Id.*

However, if a party makes a reasonable accommodation claim, then the Court applies a modified burden-shifting analysis. *Id.* A plaintiff at all times retains the burden of persuading the trier of fact that she has been the victim of illegal discrimination due to her disability. First, she must make a facial showing that she has an ADA disability and that she has suffered an adverse

- 9 -

employment action.[12] Then she must make a facial showing that she is a qualified individual. *Id*.

To be a qualified individual within the meaning of the ADA, an employee must possess the requisite skill, education, experience, and training for her position, and be able to perform the essential job functions, with or without reasonable accommodation. *Id*. Although the plaintiff retains the ultimate burden of proving that she is a qualified individual, if the employer disputes that the employee can perform the essential functions of the job, then the burden shifts to the employer to put on some evidence of those essential functions. *Id*. If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, then the employee must rebut that showing with evidence of her individual capabilities. *Id*. At that point, the employee's burden merges with her ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination. *Id*.

Peter appears to advance both discrimination and reasonable accommodation claims. But both claims fail on the same point: the record establishes as a matter of law that Peter was not a qualified individual within the meaning of the ADA. Specifically, Peter was unable to perform essential job functions, with or without reasonable accommodation.

Essential functions of a position are the fundamental duties of the job, but not its marginal functions. *Kallail,* 691 F.3d at 930. An employer's judgment on this question is highly probative. *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003). It is the written job description, the employer's judgment, and the experience and expectations of management generally that establish the essential functions of the job. *Knutson v. Schwan's Home Serv.,* 711 F.3d 911, 915 (8th Cir. 2013). Evidence to consider in this determination may include: (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not

---

[12] The City does not dispute Peter had a disability. But it is not clear that Peter's physical limitations would have met the ADA definition of a disability. *See Lundquist v. Rice Mem. Hosp.,* 121 Fed. Appx. 664, 667 (8th Cir. 2005); *see also Schulz v. Rental Servs. Corp.,* 200 Fed. Appx. 616, 617 (8th Cir. 2006). Nor is it clear that Peter's injury, despite her lengthy rehabilitation, was sufficiently long or severe to constitute a disability. To be a disability, an impairment's impact must be permanent or long term. *Samuels v. Kansas City Mo. Sch. Dist.,* 437 F.3d 797, 802 (8th Cir. 2006). The City's failure to raise this issue has complicated the Court's analysis: because the standards applicable to ADA claims assume the existence of a long-term impairment, they do not neatly apply to an injury such as Peter's which, while obviously serious, was always expected to heal. Nonetheless, the Court has assumed the existence of a "disability" for purposes of this motion.

requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs. *Id.* at 914.

And there is no issue of fact here as to the essential functions of the job of a firefighter. Essential functions include the fundamental job duties of the employment position the individual with a disability holds or desires. *Alexander,* 321 F.3d at 727. The essential duties of the City's firefighters included physical demands that Peter, while injured, could not meet. *See* filing 32-5 at 89-92. And Peter does not seem to contend otherwise.

Instead, Peter seems to assume that the light duty and reduced schedule she sought was a reasonable accommodation because it was provided to Steube. But prior accommodations do not make an accommodation reasonable. *Ivey v. First Quality Retail Serv.,* 490 Fed. Appx. 281, 285 (11th Cir. 2012). An employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation.[13] *Rehrs v. Iams Co.,* 486 F.3d 353, 358 (8th Cir. 2007). And an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job. *Knutson,* 711 F.3d at 916. The ADA did not require the City to provide Peter with light duty that eliminated essential functions of the job.[14] *See Ivey,* 490 Fed. Appx. at 286. "[I]t is axiomatic that a person who cannot perform any of the functions of a job, with or without reasonable accommodation, cannot, as a matter of law, be considered 'otherwise qualified' under the ADA." *Peyton v. Fred's Stores of Ark.,* 561 F.3d 900, 903 (8th Cir. 2009).

Peter also argues that the City failed to engage her in an interactive process to identify a potential reasonable accommodation. Where the employee requests accommodation, the employer must engage in an informal, interactive process with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations. *Battle v. United Parcel Serv., Inc.,* 438 F.3d 856, 862 (8th Cir. 2006). An employer hinders this process when: the employer knows about the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith. *Id.* at 862-63.

---

[13] Even intermittent FMLA leave does not excuse an employee from the essential functions of the job. The leave provisions of the FMLA are wholly distinct from the reasonable accommodation obligations of the ADA. *Hatchett,* 251 F.3d at 675 n.4.

[14] The fact that Steube was provided with accommodations does not avail Peter on her discrimination claim either. Peter repeatedly contends that she and Steube were similarly situated. Obviously, treating similarly disabled people differently does not prove discrimination on the basis of *disability*.

But there is no per se liability if an employer fails to engage in an interactive process. *Alexander*, 321 F.3d at 728. And under the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process. *Id.* at 864. Because Peter has failed to identify a reasonable accommodation that would have permitted her to perform the essential functions of her job, the City cannot be liable for failing to engage in an interactive process.

And because Peter could not perform the essential functions of the job, with or without a reasonable accommodation, she is not a qualified person under the ADA, and cannot prove either a discrimination or reasonable accommodation claim. Accordingly, the Court will grant the City's motion for summary judgment as to Peter's ADA claim.

IT IS ORDERED:

1. The City's motion for summary judgment (filing 31) is granted in part, and taken under advisement in part.

2. Peter's ADA claim is dismissed.

3. Peter shall, on or before September 3, 2013, submit a brief (and evidence, if necessary) addressing whether the City's alleged discrimination caused the adverse employment action Peter is alleged to have suffered.

4. The City may file a reply to Peter's submission on or before September 13, 2013.

5. The pretrial conference scheduled in this case is canceled, and the case is removed from the trial calendar pending disposition of the motion for summary judgment.

Dated this 12th day of August, 2013.

BY THE COURT:

John M. Gerrard
United States District Judge